Matter of A.H. (J.H.) (2025 NY Slip Op 50317(U))

[*1]

Matter of A.H. (J.H.)

2025 NY Slip Op 50317(U)

Decided on March 10, 2025

Family Court, New York County

Wilkofsky, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 10, 2025
Family Court, New York County

In the Matter of A.H., A Child Under Eighteen years of Age 
 Alleged to be Neglected by J.H., Respondent.

Docket No. NN-xxxxx-24

Special Assistant Corporation Counsel Thomas Lynch, for the NYC Administration for Children's Services
Special Assistant Corporation Counsel Taris Rodney, for the NYC Administration for Children's Services
Adam Richards, Moses Richards Notaro and Tankha, LLP, for the respondent mother
Meaghan Carey, Moses Richards Notaro and Tankha, LLP, for the respondent mother
Janice Roven, Roven Law Group, P.C., for the non-respondent father
Linda Diaz, Lawyers for Children, attorney for the subject child

Yael Wilkofsky, J.

On February 9, 2024, the petitioner Administration for Children's Services ("ACS") filed a Family Court Act ("FCA") Article 10 neglect petition against the respondent mother J.H. ("respondent mother") on behalf of the subject child A.H. ("subject child"). The petition alleges that the respondent mother neglected the subject child by failing to provide him with proper supervision or guardianship based on allegations of excessive corporal punishment. After a fact-finding hearing, and for the reasons set forth below, the Court finds that ACS failed to prove, by a fair preponderance of the evidence, that the respondent mother neglected the subject child and therefore, the petition is dismissed.
On or about February 8, 2024, the non-respondent father, M.H. ("non-respondent father") filed a family offense petition against J.H. on behalf of the subject child, based on allegations of excessive corporal punishment. On that date, the non-respondent father informed the Court that he and the respondent mother have a pending divorce matter and that parenting time with the subject child is split between himself and the respondent mother. The Court Attorney Referee issued a limited temporary order of protection against the respondent mother on behalf of the [*2]subject child. The next day, ACS filed the neglect petition. The neglect petition alleges as follows. On February 1, 2024, the respondent mother hit the subject child on his right arm resulting in a bruise. On February 6, 2024, the subject child requested an ice pack for his bruised arm from the school nurse. On February 7, 2024, the ACS Child Protective Specialist ("CPS") observed a bruise on the subject child's right inner arm, which the subject child attributed to the respondent mother hitting him. The subject child told CPS that he is afraid of the respondent mother because she has hit him and slapped him many times in the past. On February 9, 2024, at the intake appearance on the neglect petition, the Court temporarily released the subject child to the non-respondent father and issued a full stay away temporary order of protection against the respondent mother on behalf of the subject child, allowing for agency-supervised visitation and joined the family offense case with the neglect case. As the subject child's attorney told the Court that the subject child did not want to visit with the respondent mother, on September 20, 2024, the Court issued an order that the respondent mother begin therapeutic visitation with the subject child.
A fact-finding hearing on the neglect petition commenced on October 1, 2024, continued on December 3, 2024 and December 17, 2024 and concluded on February 6, 2025. At the fact-finding hearing, the petitioner introduced into evidence the subject child's birth certificate, an Oral Report Transmittal ("ORT") dated February 6, 2024, certified and delegated school nurse records and a photograph of the subject child's arm taken on February 7, 2024 and offered the testimony of CPS. At the close of the petitioner's case, the respondent introduced into evidence the curriculum vitae of Dr. A.M. ("Dr. M.") and photographs and videos of the subject child and offered the testimony of Dr. M. and the respondent mother. The attorney for the child did not present a case.
Pursuant to FCA § 1012(f)(i)(B), a subject child is neglected when his,
"physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment."
An "isolated instance of excessive corporal punishment resulting in relatively mild physical injuries...does not support a finding of neglect." In re Kennya S., 89 AD3d 570, 570 (1st Dept 2011). See also Matter of Avrie P. (Meliza T.), 185 AD3d 444 (1st Dept 2020) (a finding of neglect was not supported by the evidence that the child's mother "pulled her daughter by the arms, attempted to drag her home, and pulled her hair"); Matter of Christian O., 51 AD3d 402 (1st Dept 2008) (a finding of neglect was not supported by the evidence that, in an isolated incident, the father lost his temper and kicked the child once in the ankle); Matter of Chanika B., 60 AD3d 671 (2nd Dept 2009) (a finding of neglect was not supported by the evidence that, in an isolated incident, the father "slapped the child in the face, causing her nose to bleed, because she had disobeyed him"). Pursuant to FCA § 1046(b)(vi), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence, but if uncorroborated, such statements shall not be sufficient to make a fact-finding of abuse or neglect." To prevail at a fact-finding in a proceeding filed pursuant to Article 10 of the FCA, the petitioner must prove that a subject child has been abused or neglected by a preponderance of the [*3]evidence (see NY Fam. Ct. Act § 1046(b)(i)).
The petitioner failed to establish, by a fair preponderance of the evidence, that the respondent mother neglected the subject child. The ORT, dated February 6, 2024, establishes as follows. The source of the ORT is J.Y., school personnel the subject child's school. The "narrative" section of the ORT states,
On 2/1/24, the mother (J.H.) became upset with [the subject child] (8) and hit the child with an open hand on the right arm and grabbed the child aggressively on the arm. The child sustained two fingerprint bruises on the right forearm as a result. The mother then hit the child again. The mother often screams at the child as well. The role of the father (M.H.) is unknown.
The "miscellaneous information" section of the ORT states,
The child mentioned to the mother that he missed the father and the mothers reaction was to hit the child. The child asked the nurse at school for an ice pack. The child is "a little scared to go home with mom I hope she does not yell or hit me."
The certified and delegated school nurse records establish as follows. The subject child was treated by the school nurse on February 6, 2024, from 10:05 AM through 10:30 AM. The nurse observed a bruise on the subject child's right arm, which was treated with an ice pack. The nurse's assessment was, "c/o pain to the rt. arm when he touches it. Observed 2 red marks on the rt. forearm." The nurse also noted, "Child reported that his Mom hit him on the arm last Thursday." Following his treatment, the subject child was returned to his class and a report of the treatment was referred to Ms. J.Y. in Guidance and Ms. L.G. in the General Office. The petitioner also introduced into evidence a photograph taken by CPS on February 7, 2024. The photograph depicts two circular red marks on the subject child's arm.
CPS credibly testified as follows. On February 6, 2024, upon receipt of the ORT, CPS was assigned to investigate the allegations made against the respondent mother. On February 7, 2024, CPS interviewed the subject child at his school. CPS observed a reddish bruise on the subject child's arm and took a photograph of the bruise, which was introduced into evidence at the fact-finding. CPS did not observe any lacerations on the subject child's arm. When asked how he sustained the bruise, the subject child told CPS that on February 1, 2024, following a therapy session, the subject child was in the car with the respondent mother. The subject child started to cry because he missed the non-respondent father. The respondent mother then grabbed the subject child with one of her hands and slapped him with the other hand. The subject child also told CPS that he did not want to return to the respondent mother's home and that he was afraid of the respondent mother because she was not nice to him. The subject child told CPS that the respondent mother calls him names like "trash" and "mother fucker" in Serbian and a liar, but that he is not a liar. The subject child also told CPS that the respondent mother left him alone for hours, meaning that she would use her phone for hours and not give him any attention. The subject child told CPS that interactions with the respondent mother made him feel sad and lonely. The subject child further told CPS that the respondent mother hit him in the past and would grab him by the ear, slap him on the back of his neck and shake him by the arm if he did not like what she had cooked for him or if he was not behaving. The respondent mother told CPS that the incident the subject child described never happened and that she does not speak Serbian so she would not have called the subject child any names in Serbian. The respondent mother also [*4]told CPS that the subject child had started to withdraw from her and that she believed he had started lying to her. The respondent mother then showed CPS photographs and videos of the subject child participating in activities and sports during the weekend prior to the incident being reported but after the incident had allegedly occurred.
After ACS rested, the respondent mother presented her case. The photographs and videos that the respondent mother introduced into evidence establish as follows. A video taken on February 2, 2024 shows the subject child playing a computer game with another child during a class field trip. A photograph taken on February 2, 2024 shows the subject child with other children in the same clothing he was wearing in the video from the class field trip. A video taken on February 2, 2024 shows the subject child actively playing table tennis with another child. A photograph taken on February 2, 2024 shows the subject child playing table tennis with the same child. Two videos taken on February 3, 2024 show the subject child spinning on the ice while ice skating. A video taken on February 3, 2024 shows the subject child performing gymnastics while wearing a sleeveless top, with no visible marks or bruises on his arms. A photograph taken on February 3, 2024 shows the subject child sitting on a couch with other children while wearing a short sleeve shirt, with no visible marks or bruises on his arms. Finally, a photograph taken on February 4, 2024 shows the subject child performing gymnastics while wearing a sleeveless top, with no visible marks or bruises on his arms.
Dr. M. was qualified as an expert by the Court and credibly testified as follows. Dr. M. is an emergency medicine physician. Dr. M. reviewed the photograph of the subject child's arm taken by CPS on February 7, 2024. Dr. M. testified that the photograph showed an arm with redness, but without welts or lacerations, and explained that such redness is referred to as a contusion. Dr. M. stated that the red marks look like a superficial bruise which could be anywhere from 12-48 hours old. Dr. M. testified that, to a reasonable degree of medical certainty, the bruise could not have been five- or six-days-old because it looked fresh and because a five- or six-day-old bruise would not appear red in color, but would appear yellow, green or black and blue in color. Dr. M. further testified that the bruise in the photograph was mild and could have been caused by a grab, by falling on that area or from engaging in athletic activities.
The respondent mother credibly testified as follows. On Thursday, February 1, 2024, the respondent mother picked the subject child up from school. The respondent mother then drove the subject child to his scheduled therapy session. As the respondent mother drove home from the therapy session, she and the subject child discussed what to eat for dinner. The subject child did not seem upset, did not cry and did not mention the non-respondent father. When they arrived home, the subject child attended a chess lesson, ate dinner with the respondent mother, finished his homework and then went to bed at the respondent mother's home. The respondent mother stated that she did not hit, slap or grab the subject child at any point that day. On Friday, February 2, 2024, the respondent mother brought the subject child to school and chaperoned the subject child's class field trip to a museum. At the end of the field trip, the respondent mother kissed subject child, said goodbye and went home. At the end of the school day, the respondent mother picked the subject child up from school, they talked about their weekend plans and then the respondent mother brought the subject child to a playdate where he played table tennis with a friend. After the playdate, the respondent mother and the subject child returned to the respondent mother's home and ate dinner before the subject child went to bed.
The respondent mother further credibly testified as follows. On Saturday, February 3, [*5]2024, the respondent mother brought the subject child to his regularly scheduled weekend activities. The subject child started his day at soccer class, which lasted for about one hour and took place indoors at a school basketball court. The subject child wore a new soccer outfit that the subject child had asked the respondent mother to buy for him. The respondent mother did not notice anything unusual about the subject child during the class. Following the class, the respondent mother allowed the subject child to play for 10 additional minutes because he wanted to practice his soccer goalie skills, which included falling on the floor and landing on his elbows while defending the soccer goal. Following the soccer class, the respondent mother brought the subject child to Chelsea Piers to participate in an ice skating lesson. The respondent mother watched the subject child spinning on the ice and recorded videos of the subject child's lesson. The respondent mother did not notice anything unusual about the subject child while he skated and the subject child did not complain about any discomfort or pain during or after his skating lesson. At the end of the ice skating lesson, the subject child ate pizza and played with his friends. Following his ice skating lesson, the respondent mother brought the subject child to Chappaqua, New York for a two-hour gymnastics lesson. The respondent mother recorded videos of the subject child during his gymnastics lesson. The subject child wore his typical gymnastics outfit, consisting of a sleeveless top and long leggings. The respondent mother did not notice any bruises on the subject child's arms or anything unusual about the subject child during the lesson and the subject child did not complain about any discomfort or pain during or after his gymnastics lesson. After the gymnastics lesson, the respondent mother and the subject child ate food and drove home. At home, the subject child did some homework and played. That evening, the subject child had a playdate with a friend. The respondent mother did not notice anything unusual about the subject child that night and noted that the subject child seemed happy. The subject child slept at the respondent mother's home again that night.
The respondent mother further credibly testified as follows. The next day, Sunday, February 4, 2024, the subject child and the respondent mother played outside. The respondent mother then brought the subject child back to Chappaqua, New York for another gymnastics lesson. The subject child wore a sleeveless shirt with his arms exposed. The subject child was able to complete all his gymnastics exercises and the respondent mother did not notice anything unusual about the subject child or any marks or bruises on his arms. Following the gymnastics lesson, the respondent mother and the subject child ate food and then went home. The respondent mother and the subject child then spent time with the respondent mother's brother and his daughter, the subject child's cousin, at the respondent mother's apartment. After the visit from the respondent mother's brother, the subject child and the respondent mother went outside to play soccer. That night, the subject child slept at the respondent mother's home. The next day, Monday, February 5, 2024, the respondent mother brought the subject child to school. The respondent mother did not notice anything out of the ordinary with the subject child or any marks or bruises on his arms and the subject child did not seem to be in pain.
The respondent mother further credibly testified as follows. On February 5, 2024 and February 6, 2024, the non-respondent father was responsible for picking the subject child up from school in accordance with their parenting time schedule. On February 7, 2024, the respondent mother picked the subject child up from school. The respondent mother and the subject child played soccer in the gym inside the respondent mother's apartment building. In the gym, the subject child again practiced falling on the floor defending the soccer goal. The respondent mother and the subject child then went to the respondent mother's home to eat dinner. [*6]As the respondent mother was getting the subject child ready for bed, she noticed some redness on the subject child's skin near his elbow. The respondent mother asked the subject child what caused the redness and the subject child replied, "Daddy didn't do it." The respondent mother then repeated the question and the subject child paused, and then said that he was tired and wanted to go to bed. They did not further discuss the redness on the subject child's arm. On February 8, 2024, the respondent mother was contacted by CPS. The respondent mother was not aware of why she was being contacted. When CPS told the respondent mother about the allegations, she denied ever hitting the subject child. The respondent mother told CPS that she had photographs and videos of the subject child that she believed would be relevant to the ACS investigation. The respondent mother stated that she disciplines the subject child by raising her voice, that she never hits the subject child for not eating his food, that she does not call him any mean names in any language and that she knows the subject child is not afraid of her. The respondent mother believes that the subject child is a good and wonderful kid but that he has been influenced.
Based on the evidence presented at the fact-finding hearing, the Court finds that ACS failed to prove, by a fair preponderance of the evidence, that the respondent mother neglected the subject child, as defined in Article 10 of the FCA. As an initial matter, the petitioner failed to prove neglect based on the allegations in the petition that the respondent mother inflicted excessive corporal punishment on the subject child prior to February 1, 2024. The only evidence of such behavior offered at the fact-finding hearing is the subject child's statements to CPS that the respondent mother grabbed, slapped and shook him in the past. However, these statements were not corroborated at the fact-finding and are therefore insufficient to sustain a finding of neglect. (see NY Fam. Ct. Act § 1046(b)(vi)).
Additionally, considering the totality of the evidence presented at the fact-finding hearing, the petitioner also failed to prove, by a fair preponderance of the evidence, that the February 1, 2024 incident alleged in the petition actually occurred. CPS credibly testified that the subject child told her that he was hit by the respondent mother, and that it resulted in the red bruise CPS observed on his arm six days later. However, the evidence presented by the respondent undermines the reliability of the subject child's statements. Specifically, the Court credits the respondent mother's testimony that she did not hit or grab the subject child at any point on February 1, 2024 or otherwise, that she did not observe any marks or bruises on his arms in the days immediately following the alleged incident, that she did not notice any change in the subject child's demeanor or behavior and that the subject child continued to participate in all of his regular activities at a high level in the days that followed. Further, the Court credits the testimony of Dr. M. that the bruise in the photograph taken on February 7, 2024, which was offered into evidence by the petitioner, was not five or six days old and was actually 12-48 hours old, which undermines the subject child's report to the school nurse and CPS that the bruise at issue was the result of a hit or grab by the respondent mother on February 1, 2024. Additionally, the photographs and videos of the subject child offered by the respondent, which show the subject child engaging in activities in the days following the alleged incident, establish that there were no apparent marks or bruises on the subject child's arms.
In any event, even if the petitioner proved, by a fair preponderance of the evidence, that the incident on February 1, 2024 actually occurred, such evidence would not be sufficient to sustain a finding of neglect. Indeed, evidence of one isolated incident in which the respondent mother lost her temper and spontaneously grabbed or hit the subject child's arm, resulting in [*7]relatively mild physical injury, is not sufficient to sustain a finding of neglect under the law. Here, not only is the subject child's injury mild, the respondent mother's conduct was less severe than the conduct of the respondent parents in Matter of Avrie P. (Meliza T.), Matter of Christian O. and Matter of Chanika B., none of which was sufficient to sustain a cause of action for neglect. 
Therefore, as the Court finds that the petitioner failed to establish, by a preponderance of the evidence, that the respondent neglected the subject child, the neglect petition against the respondent mother is dismissed. All orders issued by this Court on the neglect docket are therefore also dismissed. This constitutes the decision and order of the Court.
Dated: March 10, 2025
New York, NY
ENTER:
Hon. Yael Wilkofsky, JFC